# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

**KATHERINE OBINGER**,

       Plaintiff,

    v.

**JO ANNE B. BARNHART,**
**Commissioner of the Social Security**
**Administration,**

       Defendant.

Civil No. 04-4553 (ADM/JGL)

**REPORT AND**
**RECOMMENDATION**

---

## APPEARANCES

Andrew E. Kline, Esq., on behalf of Plaintiff Katherine Obinger

Lonnie F. Bryan, Assistant United States Attorney, on behalf of Defendant Jo
Anne B. Barnhart

---

JONATHAN LEBEDOFF, Chief United States Magistrate Judge

       Plaintiff Katherine Obinger seeks judicial review of the final
decision of the Commissioner of Social Security ("Commissioner"), who denied
her applications for supplemental security income and disability insurance
benefits.  The matter has been referred to the undersigned Chief United States
Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. §
636 and D. Minn. LR 72.1.  The parties have submitted cross motions for
summary judgment.  For the reasons set forth below, this Court recommends

that the Commissioner's decision be affirmed and the case be dismissed with prejudice.

## I.   INTRODUCTION

Ms. Obinger filed applications for Disability Insurance Benefits and Supplemental Security Income on January 22, 2002.  (R. at 103-05, 450-52.)  She alleges disability since January 17, 2002, due to a number of physical and mental impairments.  (R. at 103.)  The Social Security Administration denied the applications initially and on reconsideration.  Ms. Obinger timely requested a hearing, which was held before an Administrative Law Judge  ("ALJ") on December 11, 2002.  (R. at 98.)  Ms. Obinger, who was represented by counsel, testified at the hearing, as did her mother, Cynthia Obinger, and her treating psychologist, Mary Beth Scanlon, Ph.D.  (R. at 38-52, 59-64.)  Harry D. Hoberman, Ph.D., testified as a neutral medical expert, and Mary A. Harris, M.S., testified as a neutral vocational expert.

On January 21, 2003, the ALJ issued an unfavorable decision.  (R. at 31-32.)  The ALJ employed the five-step, sequential analysis provided in 20 C.F.R. § 416.920 (2003).  At step one, the ALJ found that Ms. Obinger had not engaged in any substantial gainful activity since the alleged onset of disability.  (R. at 23.)  At step two, the ALJ found that Ms. Obinger was severely impaired by Russell-Silver syndrome, fibromyalgia, sleep apnea, headaches,

degenerative disc disease of the cervical spine, allergies, obesity, an affective

disorder, a cognitive disorder, n.o.s., an anxiety disorder, and polysubstance

abuse by history.  (R. at 31.)  At step three, however, the ALJ determined that

Ms. Obinger's impairments did not meet or equal a listing in the Listing of

Impairments pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2003).  (Id.) At

step four, the ALJ further determined that Ms. Obinger retained the residual

functional capacity ("RFC") to perform a modified range of light and/or

sedentary work, but not the RFC to perform her past relevant jobs.  (Id.)

Finally, at step five, the ALJ found that Ms. Obinger was not disabled because

she could perform a significant number of light and sedentary jobs existing in

Minnesota, such as a hand packager or small products assembler.

Ms. Obinger sought review of the ALJ's decision by the Appeals

Council.  After considering additional evidence submitted by Ms. Obinger (R.

at 11), the Appeals Council denied her request, and the ALJ's decision became

the final decision of the Commissioner.  (R. at 10.)

## II.      DISCUSSION

Judicial review of the Commissioner's decision is limited to a

determination of whether that decision is supported by substantial evidence

on the record as a whole.  See 42 U.S.C. § 405(g) (2000); Brand v. Sec'y of

Dep't of Health, Educ., & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  In

determining whether evidence is substantial, the Court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  If the Commissioner's decision is based on substantial evidence in the record, the Court may not reverse it merely because other substantial evidence would have supported a different outcome.  Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)).

In her motion for summary judgment, Ms. Obinger primarily challenges two aspects of the Commissioner's decision:  (1) the ALJ's determination that Ms. Obinger's impairments do not meet or equal an impairment in the Listing of Impairments; and (2) the ALJ's assessment of Ms. Obinger's subjective complaints of pain and fatigue as they relate to her RFC. In the context of these challenges, Ms. Obinger alleges that in step four of the sequential analysis, the ALJ did not adequately consider the opinion and testimony of Ms. Obinger's treating psychologist, the observations and testimony of her mother, and the opinion of her rehabilitation counselor. [1]

---

[1] Ms. Obinger also alleges, in passing, that the ALJ erred by limiting Ms.

A.      **The Record Evidence**

Ms. Obinger's alleged onset of disability date is January 17, 2002, and the Court will focus on the medical records from or near this date.

On July 20, 1998, Ms. Obinger underwent a psychological evaluation by Dr. Paul Marshall, Ph.D., a clinical neuropsychologist and licensed psychologist.  (R. at 213-22.)  In his report, Dr. Marshall relied primarily on testing conducted by Dr. Edelson in 1994, and he also referred to testing conducted by a school psychologist, Dr. Allen, in 1992.  (R. at 214.)  Dr. Marshall indicated that Ms. Obinger functioned in the average range of general intellectual abilities.  (Id.)  Furthermore, Ms. Obinger's short term and recent memory functions for oral and visual material appeared intact.  (R. at 218.)  Moreover, Dr. Marshall indicated that although Ms. Obinger did not exhibit memory deficits per se, her executive functioning deficits might interfere with her ability to learn and recall information.  (R. at 220.)  With respect to Ms. Obinger's executive functioning, Dr. Marshall had administered five specific tests.  (R. at 216.)  Two tests returned normal results, and the remaining three revealed mild deficits in Ms. Obinger's executive functioning.

Obinger's post-hearing argument to two pages.  (Pl. Mem. at 16)  The Court rejects this argument and finds that the ALJ did not err in instructing Ms. Hastings, Ms. Obinger's former attorney, to submit a two-page post hearing argument – a request to which Ms. Hastings did not object.  (R. at 75.)

(R. at 216-18.)  Dr. Marshall explained that these mild deficits would cause mild difficulties in her daily functioning.  (R. at 219.)

In 1999, Ms. Obinger underwent reconstructive surgery on both ears to address her chronic ear problems.  (R. at 235-36.)  From 1999 to 2000, Ms. Obinger visited the emergency room in Regina Medical Center for complaints of, inter alia, lower back and shoulder pain, twisted left ankle, dizziness, and pain weakness while at work.  (R. at 238-42.)  Relating to Ms. Obinger's complaints of lower back pain, Dr. Schock, the emergency room physician, stated that Ms. Obinger's "[e]xam reveals a young woman in no particular distress."  (R. at 241.)  He also observed that Ms. Obinger had a "fairly decent range of motion . . . good heel to toe walking . . . [and] good strength of the lower extremities."  (Id.)  With respect to Ms. Obinger's complaints of dizziness and weakness at work on that day, another emergency room physician, Dr. Meyer, opined that plaintiff is a "22 year old white female with some mild dizziness who has taken her Nortriptyline at an abnormal time in the morning which is probably contributing to mild orthostatic hypotension."  (R. at 242.)

On February 13, 2002, Ms. Obinger came to Dr. Spinelli with complaints of pain relating to her fibromyalgia symptoms.  She also complained about her chapped hands.  (R. at 294.)  Ms. Obinger reported that

6

she was trying to get on social security disability.  (Id.)  In response to her

fibromyalgia complaints, Dr. Spinelli instructed her to become involved in

fibromyalgia treatment programs.  (Id.)  He noted that she had been given

information on those programs in the past but chose not to participate.  (Id.)

With respect to chapped hands, Dr. Spinelli recommended that she use a

hydrating cream such as Nivea or Neutrogena.  (Id.)

On March 5, 2002, Ms. Obinger met with Dr. Katz for an

evaluation of her growth hormone deficiency related to her history of Russel-

Silver syndrome.  (R. at 331.)  Dr. Katz noted that Ms. Obinger has been

taking growth-hormone medications and reported better energy level following

this treatment.  (Id.)  He also reported that Ms. Obinger complained that her

neck pain increased with lateral head turning.  (Id.)  Noting that Ms. Obinger

took Tylenol PRN for her headaches, Dr. Katz prescribed Midrin and instructed

her to take it for headaches.  (Id.)

On April 26, 2002, Dr. Aaron Mark, a physician with the State of

Minnesota Disability Determination Services, examined Ms. Obinger and

submitted an opinion relating to her residual functioning capacity.  (R. at 413.)

Dr. Mark stated that Ms. Obinger complained of joint pain and arm

numbness.  (Id.)  He reported that Ms. Obinger stated that she has problems

sitting for a long time.  (Id.)  Dr. Mark observed that an MRI of Ms. Obinger's

7

neck revealed a failure of segmentation in C2 and C3, but stated that he was unsure that this should cause her pain.  (Id.)  He further noted that "the rest of the exam was perfectly normal."  (Id.)   Dr. Mark remarked that that the last exam relating to Ms. Obinger's back in 2000 was "really unrevealing."  (Id.)  Dr. Mark concluded that Ms. Obinger could perform "a light RFC" and put in a full eight-hour work day.  (Id.)

On May 1, 2002, Ms. Obinger again met with Dr. Katz.  (R. at 329-30.)  Dr. Katz noted Ms. Obinger's history of growth hormone deficiency. (Id.) He recommended that Ms. Obinger discontinue with her growth hormone treatment, citing her lack of improvement. (Id.)  However, Ms. Obinger reported her headaches had improved and that she needed less therapy for them.  (R. at 329.)  Ms. Obinger stated that she had been taking Midrin on occasion for more intense headaches, but she used it infrequently because it causes fatigue.  (Id.)  Dr. Katz also noted that Ms. Obinger smoked between one-half and one pack per day and was not interested in quitting.  Dr. Katz further noted that Ms. Obinger was sexually active and used birth control.  (Id.)  Ms. Obinger stated that her last pelvic examination was one year ago with Dr. Spinelli and that it was fine.   Dr. Katz noted that Ms. Obinger's anxiety was "currently well controlled." (R. at 330.)

On February 8, 2002, Ms. Obinger underwent an intake evaluation with Dr. Scanlon, a licensed psychologist.  Dr. Scanlon stated that Ms. Obinger came to therapy at the request of her mother, who was concerned "about some depression after losing a job."  (Id.)  Dr. Scanlon reported that Ms. Obinger indicated that she had reconstructive surgery on her ears and that her ear problems had since diminished.  (R. at 363.)  Dr. Scanlon noted that the neuropsychological evaluation conducted several years ago suggested that Ms. Obinger had difficulties with executive abilities, cognitive flexibility, and planning and organization.  (R. at 364.)  Dr. Scanlon recorded that Ms. Obinger was taking Paxil and Nortiptyline.  Ms. Obinger reported that she felt better on the medication.  Ms. Obinger also reported that she was taking anti-inflammatory medication for her joint pain and that the pain "has not been so bad lately."  (Id.)  In her diagnoses, Dr. Scanlon indicated that Ms. Obinger's level of psychosocial stressors was moderate.  (Id.)

On April 2, 2002, Dr. Scanlon conducted an MMPI Interpretation of Ms. Obinger.  (R. at 360.)  In describing Ms. Obinger's "overall adjustment," Dr. Scanlon stated that Ms. Obinger was not currently reporting much stress.  (Id.)  Dr. Scanlon also stated that Ms. Obinger may be exaggerating her physical symptoms.  (Id.)  She observed that Ms. Obinger's MMPI-II profile suggested that Ms. Obinger was excessively concerned about vague physical

complaints and that she reacted more to her symptoms than is common for someone with clear medical problems.  (Id.)  In her diagnostic impressions, Dr. Scanlon reported that Ms. Obinger's profile did not suggest a clear cut Axis I diagnosis but that her profile did suggest a depressive disorder, as well as interpersonal difficulties.  (Id.)

On May 7, 2002, Ms. Obinger had a 30-minute psychotherapy session with Dr. Scanlon.  (R. at 361.)  During that session, Ms. Obinger denied having hallucinations or delusions.  (Id.)  Ms. Obinger also talked about being sad and down often.  (Id.)  She reported self-esteem problems and "a down mood" that Dr. Scanlon believed to be consistent with dysthymia.  (Id.)

On September 27, 2002, Dr. Scanlon prepared a narrative report for the Social Security Commissioner.  In that report, she opined that Ms. Obinger could not qualify for social security benefits based solely on the diagnoses of dysthymia or depressive symptoms.  (R. at 430.)  However, she indicated that the most important factor relating to Ms. Obinger's daily functioning was her "defensive style."  (Id.)  Dr. Scanlon opined that Ms. Obinger is not open to comments relating to her work performance and tends to blame others for her mistakes.  (Id.)  Dr. Scanlon then outlined certain issues related to Ms. Obinger's cognitive functioning, and relied on the neuropsychological study conducted by Dr. Marshall in 1994.  (R. at 431.)  In

addition, Dr. Scanlon noted that Ms. Obinger has difficulties with

interpersonal relationships and becomes too attached in her relationships.  (R.

at 432.)  Furthermore, Dr. Scanlon opined that her "personality dynamics" in

combination with other factors contribute to Ms. Obinger's difficulties in

functioning.  (Id.)

On July 9, 2003, Dr. Scanlon executed a mental impairment

questionnaire in which she diagnosed Ms. Obinger with dysthymia and

personality disorder.  (R. at 459.)  Dr. Scanlon stated that plaintiff was

"oriented" and that her "thinking is non-psychotic."  (Id.)  Dr. Scanlon observed

that Ms. Obinger's "mood is mildly down."  (Id.)  Among other things, Dr.

Scanlon indicated the level of Ms. Obinger's abilities required to do unskilled

work.  She characterized Ms. Obinger's ability to remember work-like

procedures as "limited but satisfactory."  She reached the same conclusion

about Ms. Obinger's ability to understand, remember, and carry out very short

and simple instructions; to sustain an ordinary routine without special

supervision; to make simple work-related decisions; and to ask simple

questions or request assistance.  (R. at 461.)  Dr. Scanlon concluded that Ms.

Obinger had "unlimited or very good" ability to respond appropriately to

changes in a routine work setting, to be aware of normal hazards, and to take

appropriate precautions.

However, Dr. Scanlon also opined that Ms. Obinger could not meet competitive standards in accepting instructions and responding appropriately to criticisms from supervisors.  She reached the same conclusion with respect to Ms. Obinger's ability to get along with co-workers.  (Id.)

With respect to Ms. Obinger's abilities to perform a particular job, Dr. Scanlon found that she has "unlimited or very good" ability to interact appropriately with the general public, to adhere to basic standards of cleanliness, to travel in infamiliar places, and to use public transportation. She identified that Ms. Obinger's ability to maintain socially appropriate behavior as "limited but satisfactory."  (Id.)

Additionally, Dr. Scanlon noted Ms. Obinger's low tolerance for pain.  (Id.)  She indicated that Ms. Obinger had no episodes of decompensation.  (Id.)  With respect to functional limitations, she concluded that Ms. Obinger had "moderate" restrictions in daily living, "extreme" difficulties in social functioning, and "marked" difficulties in maintaining concentration, persistence, or pace.  (Id.)

**B.    Whether the ALJ Properly Determined That Ms. Obinger's Impairments Do Not Meet or Equal an Impairment in the Listing of Impairments**

It is well established that "the burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing."  Johnson v.

12

<u>Barnhart</u>, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-531 (1990)).  To satisfy a Listing, an impairment must meet all of the Listing's specified criteria.  <u>Sullivan</u>, 493 U.S. at 530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.")  Ms. Obinger challenges the ALJ's finding that she is not subject to "any impairment, or combination of impairments, which meets or equals the requirements of the Listing of Impairments in Appendix 1, Subpart P, Regulation No. 4."  (R. at 26.)  She alleges that the ALJ erred by failing to provide "any basis" for her findings with respect to Ms. Obinger's physical impairments.  The Court disagrees.

### 1.    Consideration of Ms. Obinger's Impairments in "Combination"

The Court rejects Ms. Obinger's contention that the ALJ failed to consider the combination of her physical and mental impairments in determining that she is not disabled.

First, the ALJ specifically stated in her decision that Ms. Obinger did not suffer "any impairment, or <u>combination</u> of impairments" that satisfies the Listing requirements.  (<u>Id</u>.) (emphasis added).   This finding was "based on

a careful review of the record, the testimony of Dr. Hoberman, and the evaluation of the claimant's mental impairments."[2]  (Id.)

As stated above, Ms. Obinger bore the burden to establish that her impairments – physical, mental, or some combination thereof – satisfy the Listing of Impairments.  Ms. Obinger testified at the administrative hearing, responded to the ALJ's questions, and was examined by her own attorney about her physical impairments.  (R. at 39-51.)  Additionally, Ms. Obinger addressed all of her concerns in her responses to the Daily Activities Questionnaire and other documents submitted to the Social Security Administration.  (R. at 169.)  As such, the record adequately reflects the issues relating to Ms. Obinger's complaints of physical problems.  Therefore, in making her determinations about Ms. Obinger's physical impairments, the ALJ relied on a thorough and well-developed record.  The same holds true for Ms. Obinger's allegations of mental impairments.

To the extent that Ms. Obinger faults the ALJ's finding that her physical impairments do not satisfy the Listing, the Court observes that Ms.

---

2  Ms. Obinger's allegation that Dr. Hoberman specified that his testimony was limited "just to mental health issues" is ill-founded.  (R. at 68.)  The statement in question referred to Dr. Hoberman's answer to the ALJ's question "in terms of the B criteria" of section 12.04.  The record and Dr. Hoberman's testimony suggest that, as a neutral medical expert, he did not limit his review to Ms. Obinger's mental impairments.  For example, Dr. Hoberman's hearing testimony referenced Dr. Katz, Ms. Obinger's treating internist.

Obinger failed to specify which physical impairments are at issue; nor does she specify which listings her impairments allegedly satisfy.

Furthermore, the only record evidence relating to Ms. Obinger's allegation that the "combination" of her physical and mental impairments renders her disabled comes from her treating psychologist, Dr. Scanlon, in the form of conclusory statements in letters to the Social Security Commissioner. For example, Dr. Scanlon stated that it is "my belief that the combination of cognitive deficits, emotional concerns, and physical problems make it impossible for Katie to support herself." (R. at 359, 432.) Dr. Scanlon also stated Ms. Obinger's "functioning will further deteriorate as her physical problems become more overwhelming." (R. at 433.)

However, an ALJ may reject an opinion of a treating psychologist "when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the record as a whole." Flaherty v. Halter, 182 F. Supp. 2d 824, 843 (D. Minn. 2001) (citations omitted). The "vague, conclusory statement" by Dr. Scanlon relating to Ms. Obinger's ability to satisfy the Listing criteria is not entitled to substantial weight. See id. The Court finds that Dr. Scanlon's assertions were conclusory comments, not definitive statements based on medical or clinical evidence. For

15

example, Dr. Scanlon never specified which of Ms. Obinger's physical

problems she actually considered.  See Frecker v. Barnhart, 1:02-CV-296,

2003 WL 2003 WL 21918646, at *8 (N.D. Ind. Feb. 21, 2003) (noting that

where a psychologist who evaluated plaintiff's mental impairments also made

an ambiguous statement about the onset of plaintiff's physical pain, "it is not

the job of either the ALJ or the Court to divine such an explanation for him.")

As such, the ALJ did not err by giving Dr. Scanlon's conclusory opinions less

weight than the opinion of Dr. Hoberman, whose opinion and testimony were

well supported by the record as whole.

         Additionally, based on the record evidence in general, and the

medical evidence relating to Ms. Obinger's physical impairments in particular,

there is no support for Dr. Scanlon's conclusion that Ms. Obinger's physical

problems should "become more overwhelming."  (R. at 433.)  On the contrary,

the record suggests that Ms. Obinger's physical health had improved.  For

example, she reported having more energy after taking growth hormone

medication and experiencing fewer headaches.  (R. at 329, 331.)  She further

testified that her medications alleviate at least some of her physical concerns.

(R. at 42.)  With respect to Ms. Obinger's fibromyalgia symptoms, the record

shows that she failed to comply with the medical advice of Dr. Spinelli, one of

her treating physicians, as well as the opinion of the doctors at the

Fibromyalgia Treatment Center.  (R. at 297, 443-48.)  As such, Ms. Obinger

has failed to take steps to assist in her recovery. <u>See</u> <u>Flaherty</u>, 182 F. Supp. 2d

at 829 ("A claimant's refusal to take medication that may mitigate his or her

disability is inconsistent with a claim of a disability.") (citing <u>Baumgarten v.</u>

<u>Chater</u>, 75 F.3d 366, 368 (8th Cir. 1996)).  Therefore, the ALJ did not err in

finding that Ms. Obinger's short pain treatment history and failure to comply

with her doctors' recommendations suggest that she is not disabled.

        Finally, Dr. Scanlon's conclusion about Ms. Obinger's physical

problems is also inconsistent with her own notes and evaluations, including

the most recent RFC Form dated July 9, 2003.  There, Dr. Scanlon reiterates

that Ms. Obinger exaggerates her physical problems and "reacts more to her

symptoms than is common for an individual with clear medial problems."  (R.

at 360, 462.)  Importantly, the ALJ did not reject Dr. Scanlon's opinion that

Ms. Obinger's physical impairments were severe.  Instead, she found that

although Ms. Obinger suffered from a number of severe impairments, those

impairments were not disabling.  (R. at 31.)

        The ALJ's consideration of Dr. Scanlon's opinion relating to Ms.

Obinger's physical impairments is supported by substantial evidence.   The

record evidence, including Dr. Scanlon's opinions, does not establish that the

ALJ erroneously considered Ms. Obinger's impairments in combination.

**2.    The ALJ's Assessment of Ms. Obinger's Mental Impairments**

The ALJ concluded that there was evidence that the Ms. Obinger was subject to one or more mental impairments. Specifically, the ALJ agreed with Dr. Scanlon's and Dr. Hoberman's diagnosis that the Plaintiff was subject to the mental impairments of an affective disorder under section 12.04 of the Listings, and an anxiety disorder under section 12.06 of the Listings.  (R. at 25, 66.)  Thus, her mental impairments were most appropriately evaluated under Section 12.04, Affective Disorders and Section 12.06, Anxiety Related Disorders.  (Id.)

After finding that Ms. Obinger's symptoms satisfied criteria "A" of Listings 12.04 and 12.06, the ALJ next considered whether Ms. Obinger's impairments satisfy the "B" criteria of the Listing of Impairments 12.04 and 12.06.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04, 12.06.  Criteria "B" of the Listings 12.04 and 12.06 related to (1) daily activities; (2) social functioning; (3) concentration, persistence, and pace; (4) episodes of decompensation.  Id.

With respect to daily activities, the ALJ found that Ms. Obinger had mild restrictions of activities of daily living.  (R. at 25-26.)  The determination was based on a careful review of the record – including, inter alia, medical evidence, Ms. Obinger's testimony, her answers in the daily

18

activities questionnaire, the opinion of Dr. Scanlon and Dr. Marshall and the

testimony of Dr. Hoberman.  (Id.)  The ALJ highlighted Ms. Obinger's

testimony and responses to daily activities questionnaire that she drove a car,

cooked, cleaned the house, shopped, watched TV, groomed and bathed herself,

played cards and games, worked on puzzles and went out to eat and to the

movies.  (R. at 25.)  In addition, the ALJ noted that during the period in which

she alleged to have been disabled, Ms. Obinger worked twenty five to thirty

hours a week until October 2002.  (R. at 26.)

        With respect to Ms. Obinger's social functioning, the ALJ found

that Ms. Obinger suffered from moderate restrictions.  This determination was

also based on the record as a whole, including the opinion and Dr. Hoberman

and Dr. Scanlon, as well as the testimony of Ms. Obinger and the observations

of her father.  (Id.)  For example, the ALJ documented that Ms. Obinger

testified that she had friends, got along with family members and had no

problems with authority figures.  (Id.)  Notably, the ALJ's finding that Ms.

Obinger would have moderate restrictions in social functioning is consistent

with Dr. Scanlon's statement that Ms. Obinger is dependent in relationships

and Ms. Obinger's testimony that she gets frustrated when dealing with people

at times.  (R. 26, 432.)  The Court observes that the allegation about Ms.

Obinger's "marked difficulties" in social functioning is not supported by

19

medical evidence, including the clinical evaluation performed by Dr. Marshall

in 1998.  (R. at 219.)  In fact, Dr. Scanlon's conclusory statement on the

mental impairment questionnaire is the only source of this allegation.  (R. at

462.)  Notably, this statement is inconsistent with Dr. Scanlon's other notes

and evaluations, including statements made on the same mental impairment

questionnaire.  (R. at 459-462.)

       The ALJ further found that Ms. Obinger would have moderate

restrictions in maintaining concentration, persistence, and pace.  The ALJ's

finding was based on Dr. Scanlon's statement that Ms. Obinger has short term

memory problems, doesn't learn and retain information easily, and has

problems concentrating and attending.  (R. at 26.)  In addition, the ALJ

credited Dr. Marshall's findings that Ms. Obinger probably could not engage in

occupations that required skills to acquire and maintain a significant

knowledge base, but that she would be capable of performing a wide variety of

employment.  (Id.)  Furthermore, the ALJ cited the results of Ms. Obinger's IQ

tests, noting that she was in the average range of functioning.  (Id.)  Finally,

the ALJ noted that Ms. Obinger indicated that she worked as a pizza delivery

driver for two years, as a cashier for one year, and as a day care worker for

about nine months.  (Id.)  Based on the above evidence, the ALJ found that

Ms. Obinger had "the ability to concentrate and carry out work tasks with reasonable persistence and pace." (Id.)

With respect to decompensation, the ALJ found that Ms. Obinger had no episodes of decompensation.  (Id.) This finding is consistent with the substantial evidence in the record as a whole.  Notably, even Ms. Obinger's treating psychologist documented that Ms. Obinger experienced no episodes of decompensation within 12 month period.  (R. at 462.)

With respect to subsection "C" of the Listing, the ALJ found that no "C" criteria were present.  (R. at 26.)   The Court agrees that Ms. Obinger has not suffered "repeated episodes of decompensation"; nor have her impairments "resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04.  In addition, there is no "current history of 1 or more years' inability to function outside of highly supportive arrangements, with indication of continued need for such an arrangement."  Id.  Furthermore, Ms. Obinger's impairments did not "result[ ] in complete inability to function independently outside the area of one's home."  20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.06.

The ALJ's findings related to criteria "C" of the Listings 12.04 and 12.06 are consistent with testimony of Dr. Hoberman and the substantial evidence in the record as whole. As evident from Ms. Obinger's testimony, her responses to the daily activities questionnaire, her work record, and the record as a whole, her anxiety disorder did not result in complete inability to function independently outside the area of one's home. Furthermore, the ALJ's finding is consistent with the results of the evaluation conducted by the Social Security psychologists. (R. at 351.) In sum, the ALJ's finding that Ms. Obinger's mental impairments did not satisfy the Listings 12.04 and 12.06 is supported by substantial evidence in the record as a whole.

Nor did the ALJ err in relying on the opinion and testimony of Dr. Hoberman, a neutral medical expert. In fact, the ALJ was entitled to consider Dr. Hoberman's opinion, see 20 C.F.R. § 416.927(d), (f), especially where portions of other medical opinions, such as those of Dr. Scanlon, were inconsistent with the record. Id. For example, Dr. Scanlon's conclusion that Ms. Obinger is completely disabled is inconsistent with the clinical findings of Dr. Marshall, who opined that a person with Ms. Obinger's diagnosis would experience only mild restrictions in daily living and moderate restrictions in maintaining persistence and pace. (R. at 219-20.)

Importantly, in many respects, Dr. Hoberman's testimony correlated with Dr. Scanlon's treatment notes and evaluations.  Dr. Hoberman agreed that Ms. Obinger suffered from various symptoms of an affective disorder in section 12.04 of the Listing.  (R. at 28.)  He also agreed that Ms. Obinger's mental condition would cause some limitations in social and interpersonal contacts.  Consistent with the record as a whole, Dr. Hoberman opined that Ms. Obinger's mental impairments would result in mild restrictions in her daily activities, moderate restrictions in her social functioning, and moderate restrictions in her ability to maintain concentration, persistence, and pace.  (R. at 68.) This testimony is consistent with the clinical findings of Dr. Marshall, and the opinions of the Social Security physicians, Ms. Obinger's treatment history, her daily and work activities, and her own testimony relating to the limitations she suffered as a result of her mental impairments.

As stated above, Dr. Hoberman's opinion that Ms. Obinger's mental impairments do not satisfy the requirements of Listings 12.04 and 12.06 is supported by substantial evidence of the record as a whole.  As such, the ALJ was entitled to rely on Dr. Hoberman's opinion.

The Court rejects Ms. Obinger's contention that Dr. Hoberman's opinion relating to her mental impairments is refuted by the additional

evidence Ms. Obinger submitted to the Appeals Council seven months after

the ALJ's decision.  (R. at 459-65.)  When a claimant submits new evidence to

the Appeals Council, which then declines review, the Court must determine

whether the ALJ's decision is supported by substantial evidence in the record,

including the new evidence.  Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir.

1995).  Considering the new evidence, the Court finds that the ALJ's decision

remains supported by substantial evidence.  First, the additional RFC and

Listings Form from Dr. Scanlon contain numerous internal inconsistencies.  In

describing her clinical findings, including results of mental status examination

that demonstrate the severity of Ms. Obinger's mental impairments and

symptoms, Dr. Scanlon remarked that "she is oriented, thinking is

nonpsychotic.  Her mood is mildly down."  (R. at 459.)   Dr. Scanlon's

conclusion that Ms. Obinger has "extreme" difficulties in social functioning is

inconsistent with her earlier statements – on the same page of the report –

that Ms. Obinger has "unlimited or very good" capacity to interact with the

general public and that her ability to maintain socially appropriate behavior is

satisfactory.  (R. at 462.)  This evaluation does not change the Court's finding

that substantial evidence in the record as a whole supported the ALJ's finding

that Ms. Obinger's psychological impairments do not satisfy the Listings.  The

Court reiterates that although there is evidence in the record supporting Ms.

Obinger's position, the decision may not be reversed on this basis because the decision is based on other substantial evidence in the record.  See Roberts, 222, F.3d at 468.

**3.      The ALJ's Assessment of Dr. Scanlon's Opinion and Testimony**

The Court has already discussed much of the evidence from Dr. Scanlon and explained why the ALJ was entitled to discount parts of her opinions.  The Court further notes that the ALJ did not discount all of the opinions and testimony of plaintiff's treating psychologist.  Many of Dr. Scanlon's treatment records correspond with the ALJ's findings.  The ALJ acknowledged that Ms. Obinger had severe mental impairments that affect her ability to conduct daily activities, to interact with co-workers, and to maintain persistence and pace.  (R. at 25.)  Accordingly, she found that Ms. Obinger's work ability to encompass only light and/or sedentary work, "with low-stress environment, with minimal standards for production and pace; performing routine repetitive tasks at no more than a low semi-skilled level, with minimal changes in work process or practice; and only brief and superficial contact with others."  (R. at 31.)

Indeed, the ALJ referred to Dr. Scanlon's opinion frequently throughout her decision.  (R. at 26-29.)  When Dr. Scanlon's opinions were not supported by medical findings or were inconsistent with one another, the ALJ was entitled to give them less weight.  As such, the ALJ did not err in rejecting a portion of Dr. Scanlon's opinion about the severity of Ms. Obinger's mental and cognitive impairments.  (R. at 28.)

An ALJ is authorized to consider inconsistencies under § 416.927(d)(4), which the ALJ did in this case.  For example, the ALJ was entitled to discount Ms. Obinger's GAF score because it was inconsistent with other record evidence.  The ALJ explained that Dr. Scanlon's opinion that Ms. Obinger had a GAF score of 50 -- indicating serious symptoms such as "suicidal ideation, severe obsessional rituals, frequent shoplifting . . . or serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" (R. at 28) -- is inconsistent with Ms. Obinger's daily activities and work history.

In fact, Dr. Scanlon's notes and evaluations contained scant, if any, reference to Ms. Obinger's suicidal thoughts, and instead often characterized Ms. Obinger's mood as "mildly down." (R. at 361, 459.) Ms. Obinger's treating physicians and psychologist did not note that she exhibited

suicidal ideations.[3] Notably, in Ms. Obinger's new evidence to the Appeals Council and to the Court, Dr. Scanlon did not identify "thoughts of suicide" as one of Ms. Obinger's symptoms.  (R. at 460.)

In addition, shortly after Ms. Obinger's start of disability date, Dr. Scanlon indicated that Ms. Obinger's "[l]evel of psychosocial stressors [was] moderate."  (R. at 364.)  Two months later, Dr. Scanlon again reported that with respect to her overall adjustment, Ms. Obinger "is not reporting a great deal of stress at the present time."  (R. at 369.)  With respect to Ms. Obinger's friendships and other relations, the record as whole suggests that she had friends as well as other relationships.  In sum, the ALJ's decision to discount Ms. Obinger's GAF score is supported by substantial evidence in the record.

That the ALJ did not specifically refer to Dr. Scanlon's hearing testimony is immaterial.  See Wheeler v. Apfel, 224 F.3d 891, 896. (8th Cir. 2000).  First, the ALJ was not obligated to mention each factor contained in 20 C.F.R. § 416.927(d), which provides the regulatory framework for assessing medical opinions.  See Black v. Apfel, 143 F.3d 838, 896 (8th Cir. 1998) (holding that "an ALJ is not required to discuss every piece of evidence submitted.")  Second, just because the ALJ did not discuss Dr. Scanlon's

---

3   The only mention of suicide on the record is that while in college, Ms. Obinger telephoned her mother stating allegedly that "she had overdosed." (R. at 56.)  There have been no similar occurrences since that time, however.

testimony expressly in her opinion, does not mean that it did not factor in her

determination.  Id. (stating that "[a]n ALJ's failure to cite specific evidence does

not indicate that such evidence was not considered.")  Finally, Dr. Scanlon's

testimony was generally consistent with her written opinions, notes, and

evaluations, and she did not testify as to any new evidence or express a

different view relating to Ms. Obinger's impairments.

        As reflected in the ALJ's hypothetical to the vocational specialist,

much of Dr. Scanlon's opinion about Ms. Obinger's difficulties in various

aspects of life and work were considered and adopted in the ALJ's findings.

### C.  The ALJ's Assessment of Ms. Obinger's RFC Capacity

        In determining a claimant's RFC at step four of the sequential

analysis, an ALJ must evaluate the credibility of the claimant's subjective

complaints of pain.  Ramirez v. Barnhart, 292 F.3d 576, 580 (8th Cir. 2002).

In Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit

approved a standard for credibility evaluations of a claimant's pain and

subjective complaints.  The absence of supporting medical evidence is one

factor to consider in evaluating credibility.  Id. at 1322.  The ALJ must also

consider the claimant's prior work record; daily activities; duration, frequency,

and intensity of pain; dosage, effectiveness, and side effects of medication;

precipitating and aggravating factors; and functional restrictions.  Id.

"Subjective complaints may be discounted if there are inconsistencies in the record as a whole." Id. Questions of credibility are for the trier of fact, and a reviewing court should defer to the ALJ's credibility determinations if the decision expressly discounts a claimant's evidence and gives good reason to do so. Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990). "[A]s the decisions of this Circuit make clear, the interplay of the Polaski factors in any given Record, which could justify an ALJ's credibility determination with respect to a Plaintiff's subjective allegations of pain, are without limit." Flaherty, 182 F. Supp. 2d at 847 (citing Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); Garrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988)).

Ms. Obinger alleges that the ALJ failed to properly evaluate her subjective complaints of pain and fatigue under the criteria established in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). The Court disagrees.

### 1. **Ms. Obinger's Daily Activities**

"Although daily activities, alone, do not disprove disability, they are an important factor to consider in the evaluation of subjective complaints." Id. (citing Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996)). The ALJ may reject plaintiff's complaints of subjective claims when they are inconsistent with her daily activities. Ms. Obinger's daily activities support the ALJ's

29

finding that Ms. Obinger is not disabled by her physical pain and fatigue.  Ms.

Obinger's testimony and a daily activities questionnaire reveal that she cooked,

drove, cleaned the house, shopped, read, cared for children, went out to eat

and to the movies, played cards and games, and worked on puzzles.  (R. at 51-

52, 166-71.)  In addition, Ms. Obinger stated numerous times that she had "a

few very close friends and many acquaintances." (R. at 52, 168.)  The ALJ

accounted for the mild restrictions Ms. Obinger experienced in conducting

these activities, but noted that they are inconsistent with Ms. Obinger's

allegations of total disability.  (R. at 30.)  The ALJ did not err in that respect, as

the record evidence reflects that Ms. Obinger engaged in a wide range of these

activities on a routine basis.  (R. at 51-52.)  See Lawrence v. Chater, 107 F.3d

674, 676 (8th Cir. 1997) (affirming the ALJ's decision to discount credibility

where claimant could do some housework, cook, and shop); Nguyen v. Chater,

75 F.3d 429, 430 (8th Cir. 1996) (affirming ALJ's decision to discount

credibility where claimant visited neighbors, cooked her own meals, did her

own laundry, and attended church.)

         Importantly, the ALJ did not reject Ms. Obinger's subjective

complaints that she experienced physical pain when performing certain

activities.  Instead, the ALJ only discredited plaintiff's representation that the

severity of her pain limited her ability to perform any work functions.

2.    **The Inconsistencies in the Record**

Interestingly, Ms. Obinger argues that the ALJ erred in crediting her own account of pain and fatigue in the context of her daily activities, urging that the ALJ should have disregarded her own statements in this regard.  Ms. Obinger asserts that "the record is replete with evidence that the Plaintiff overstates her capabilities and understates her actual limitations."  By making this argument, Ms. Obinger admits she is not credible.

Moreover, the record repeatedly reveals that Ms. Obinger exaggerates her physical problems.  In her medical reports, Dr. Scanlon stated numerous times that Plaintiff exaggerates her physical ailments. (R. at 360, 433, 462.)  Notably, this fact is reiterated in the additional evidence that was provided to the Appeals Committee and to the Court.  There, Dr. Scanlon again stated that Ms. Obinger "has a low tolerance for pain.  She is quite defensive & focuses on physical rather than psychological concerns."  (R. at 462.)  Dr. Scanlon made similar observations in her earlier notes and evaluations, noting that Ms. Obinger "is excessively concerned about vague physical complaints. She may focus on any physical symptom and exaggerate it."  (R. at 360.) Importantly, Dr. Scanlon found that Ms. Obinger "reacts more to her symptoms than is common for an individual with clear medial problems."  (Id.) Indeed, Dr. Scanlon's finding is supported by Ms. Obinger's infrequent visits

31

to the medical doctors for her complaints relating to fibromyalgia and other physical impairments, indicating that she in fact did not require extensive, ongoing medical care for her impairments.  In sum, the Court finds that the ALJ did not err in discounting Ms. Obinger's subjective complaints of pain based on the inconsistencies in the record as a whole.

### 3.   Objective Medical Evidence

Objective medical evidence in the record supports the ALJ's finding that Ms. Obinger's subjective complaints of pain and fatigue are not credible.  The Court has already discussed much of the medical record and why it does not support Ms. Obinger's allegations of impairments.  The same holds true for her subjective complaints of pain.

Additionally, the ALJ noted that while the medical record suggests that Ms. Obinger reported neck and back pain, "an x-ray showed only a small vertebrae in the cervical area" and "[a]n MRI of the claimant's cervical spine revealed only a congenital failure of segmentation at the C2-3 level, with the remainder of the study being unremarkable."  (R. at 28.)  Furthermore, there is no medical evidence to support Dr. Scanlon's conclusory statement that Ms. Obinger  was involved "in activities that have a high probability of painful consequences which are not recognized."  (Pl. Mem. at 18.)  In fact, in the same mental impairment questionnaire, Dr. Scanlon reported that Ms.

Obinger had "unlimited or very good" capacity to be "aware of normal hazards and take appropriate precaution." (R. at 461.)   With respect to Ms. Obinger's complaints of fibromyalgia, the ALJ noted that despite her complaints, Ms. Obinger never started a fibromyalgia program.  As discussed above, the ALJ may consider a claimant's unwillingness to get treatment in determining the veracity of subjective complaints of pain, and Ms. Obinger "has received a minimal amount of conservative treatment for her neck and pain problems." (R. at 28); see also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Notably, with respect to medical treatment, Ms. Obinger testified that the only prescription medication she was taking is Paxil.  (R. at 45.)  In sum, the ALJ did not err in weighing the objective medical evidence against Ms. Obinger's credibility.

### 4.  **Ms. Obinger's Medication**

Nor did the ALJ err in assessing the effects of Ms. Obinger's medications.  Noting that Ms. Obinger took Nortriptiline and Paxil to treat the effects of her impairments, and that she experienced weight gain, dizziness, sleepiness, and hot flashes as side effects of these medications, the ALJ reduced Ms. Obinger's RFC capacity.  (R. at 30.)  The ALJ also documented Ms. Obinger's statement that she had more energy after taking the growth hormone replacement medication.  (R. at 27.)  As for Ms. Obinger's headaches,

the ALJ cited a report from Dr. Katz stating that the "headaches had improved"

and that Ms. Obinger "did not require as much therapy of headaches

anymore." (R. at 27). Furthermore, as discussed above, Ms. Obinger testified

that the only medication she was taking at the time of the hearing was Paxil.

(R. at 45.)[4] In sum, the Court finds that the ALJ did not err in his assessment

of Ms. Obinger's medications as related to her complaints of subjective pain.

### 5.   <u>Observations by Third Parties</u>

The Court finds no error in the ALJ's treatment of the

observations by Ms. Obinger's mother and of her rehabilitation services

counselor, Michelle Peterson. Neither Ms. Obinger's mother nor Ms. Obinger's

counselor qualifies as an "acceptable medical source." 20 C.F.R. §

404.1527(a)(2) (2003). Acceptable medical sources include licensed

physicians, licensed or certified psychologists, licensed optometrists, licensed

podiatrists, and qualified speech-language pathologists. <u>See id</u>. § 404.1513(a)

(2003). The opinion of a counselor such as Peterson and of Ms. Obinger's

mother is therefore not entitled to substantial weight because it does not come

from an acceptable medical source. <u>See</u> <u>Flaherty v. Halter</u>, 182 F. Supp. 2d at

---

4 The Court observes that in her mental impairment questionnaire submitted
to the Appeals Committee after the ALJ hearing, Dr. Scanlon stated that Ms.
Obinger reports no side-effects from Paxil and Nortroptilene. (R. at 459.) This
evidence further supports the Court's finding that the ALJ's assessment of the
fourth <u>Polaski</u> factor was more than adequate.

828 (citing <u>Barnett v. Apfel</u>, 231 F.3d 687, 689 (10th Cir. 2000); <u>Hartranft v.</u>

<u>Apfel</u>, 181 F.3d 358, 361-62 (3d Cir. 1999); <u>Walters v. Comm'r of Soc. Sec.</u>, 127

F.3d 525, 530 (6th Cir. 1997); <u>Diaz v. Shalala</u>, 59 F.3d 307, 313 (2d Cir. 1995);

<u>Bird v. Apfel</u>, 43 F. Supp. 2d 1286, 1291 (D. Utah 1999); <u>cf.</u> <u>Cronkhite v.</u>

<u>Sullivan</u>, 935 F.2d 133, 134 (8th Cir. 1991) (holding that the ALJ properly gave

little weight to treating chiropractor because chiropractor was not "acceptable

source")).   Accordingly, the ALJ was entitled to exercise his discretion in

considering or disregarding Peterson's opinions and did not err by declining to

accept her opinion in evaluating Ms. Obinger's RFC capacity.

The same holds true with respect to the observations and

testimony of Ms. Obinger's mother.  Notably, after referencing the testimony of

Ms. Obinger's mother, the ALJ explained that it was not given significant

weight because it was inconsistent with the record findings, and because she

was not qualified to make a disability determination.  (R. at 29.)  The ALJ did

not err in that respect.

**6.   <u>Aggravating and Mitigating Factors and Functional</u>**
**<u>Capacity</u>**

The Court finds that the ALJ properly considered Ms. Obinger's

aggravating and mitigating factors relating to her subjective complaints of pain

and correctly determined Ms. Obinger's Functional Capacity.  (R. at 30-31.)

35

Indeed, the ALJ's hypothetical to the vocational specialist encompassed all of

the Polaski factors that she considered in determining Ms. Obinger's RFC

capacity.  (R. at 70-72.)

Based on the foregoing, and all the files, records, and proceedings

herein, **IT IS HEREBY RECOMMENDED**:

(1)     Plaintiff Katherine A. Obinger's Motion for Summary

Judgment (Doc. No. 8) should be **DENIED**; and

(2)     Defendant Commissioner's Motion for Summary Judgment

(Doc. No. 11) should be **GRANTED**.

Dated:  June 28, 2005

   s/ Jonathan Lebedoff
JONATHAN LEBEDOFF
Chief United States Magistrate Judge

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and
Recommendation by filing and serving specific, written objections by July 15,
2005.  A party may respond to the objections within ten days after service
thereof.  Any objections or responses filed under this rule shall not exceed
3,500 words.  A District Judge shall make a de novo determination of those
portions to which objection is made.  Failure to comply with this procedure
shall operate as a forfeiture of the objecting party's right to seek review in the
United States Court of Appeals for the Eighth Circuit.